Virgil R. Williams and Lowell C. Williams v. Commissioner.
Williams v. Commissioner
Docket No. 72972.
United States Tax Court
T.C. Memo 1960-19; 1960 Tax Ct. Memo LEXIS 270; 19 T.C.M. (CCH) 106; T.C.M. (RIA) 60019; February 16, 1960
Charles H. Burton, Esq., for the petitioners. Charles P. Dugan, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined deficiencies in income tax of the petitioners for the years and in the amounts as follows: Addition to the
tax (Sec.
Year
Deficiencies
294(d))
1953
$2,400.98
0
1954
4,104.16
$244.73
1955
312.02
0
The issues presented for decision are largely factual and center around the following questions: (1) Whether petitioners, as a result of fires in two separate properties in 1953 and 1954, realized gain or loss from the property destroyed by fire; (2) Whether petitioners are entitled to deductions for depreciation on certain tractors, trucks, sawmills and sawmill equipment during *271 the years 1953, 1954 and 1955; (3) Whether the depreciation deduction claimed by petitioners on certain farm and rental property for the years 1953, 1954 and 1955 was correct; (4) Whether petitioners are entitled to deduct certain amounts as loss on timber contracts; and (5) Whether the additions to tax assigned against petitioners under section 294(d) of the Internal Revenue Code of 1939 for the year 1954 are proper. Findings of Fact Some of the facts have been stipulated and are found accordingly. The petitioners, Virgil R. Williams (hereinafter sometimes referred to as petitioner) and Lowell C. Williams, husband and wife, reside in Stuart, Virginia. Petitioners report their income on the cash basis. They filed timely joint income tax returns for the years 1953, 1954 and 1955 with the district director of internal revenue, Richmond, Virginia. Petitioner is engaged in a number of business activities in and around Stuart. During all the years here in question he was president and principal shareholder of the Stuart Lumber Company, a business which manufactures and sells hardwood flooring. In addition, he was for many years a dealer in lumber, engaged in farming operations *272 and operated rental property. In 1948 petitioner acquired property in Stuart, Patrick County, Virginia, known as the Cotton Mill property, at a cost of $10,000 for the land and building. The building was approximately 300 feet long and about 60 feet wide, built on a cement foundation and divided into two unequal parts by a brick fire wall. The larger portion of the building was uninsulated and used as a warehouse. The smaller section of the building, about 30 feet long and 60 feet wide, was insulated and sealed off and had a floor and flue in it so that it could be heated. This part was used by the petitioner as a carpentry shop for making windows, door frames, screens and different types of millwork which the petitioner used in the building of houses. Certain tools and equipment owned by petitioner were kept in the carpentry shop. The tools and equipment and original costs of same are as follows: Jointer saw
$1,000
Mortise machine
400
Cut-off saw (DeWalt)
500
Table saw
500
Bins & Shelving tables
500
Miscellaneous small hand tools
such as hammers, saws, hand
planers, levels, etc.
500
Total
$3,400
In April of 1953 this equipment was about four *273 or five years old and it had generally a useful life of nine or ten years. A fire occurred at the Cotton Mill property on April 25, 1953. This fire destroyed all of the carpentry shop up to the fire wall and it damaged a small part of the roof of the warehouse portion of the building. All of the equipment located in the carpentry shop was destroyed. The parties have stipulated the assessment records of Patrick County with respect to this property. They show the assessed value of the land and building separately before and after the fire. These records show an allocation of approximately 4 per cent of the assessed valuation to the land and approximately 96 per cent to the building and they also show the assessed valuation for the building was reduced by approximately 52 per cent after the fire. Petitioner carried fire insurance on the carpentry shop in the amount of $5,000 and fire insurance on the warehouse part of the building in the amount of $21,000. The petitioner in 1953 received proceeds from fire insurance companies as the result of the fire at the Cotton Mill property, as follows: Damage to Carpentry Shop
$4,000.00
Damage to Warehouse
451.08
Damage to Equipment
1,375.00
Total
$5,826.08
*274 Various adjustments of respondent were based upon his determination that the carpentry shop represented 10 per cent of the value of the building before the fire and that petitioner had a zero basis in the tools and equipment lost in the fire and the insurance proceeds ($1,375.00) constituted capital gain. The adjusted basis for the building on the Cotton Mill property at the time of the fire, not including the equipment in the carpentry shop, was $7,758.78. Fifty per cent of the value of the building on the Cotton Mill property was destroyed by fire in 1953. Petitioner's basis in the tools and equipment at the time they were destroyed by the fire was at least $1,375. In 1951 petitioner bought a one-half interest in property, located in Patrick County, known as the Patrick Springs Hotel, from Elinor B. Wallace. At the time Elinor Wallace acquired the property, she had assumed certain outstanding purchase money obligations and at the time of petitioner's purchase Elinor Wallace still owed a sizable amount on these obligations. Petitioner paid some of these obligations as the purchase price of his one-half interest in the property. The parties agree petitioner's cost for his one-half *275 interest in the Patrick Springs Hotel property was $12,162.80. The hotel was a three-story building over 100 years old containing 21 rooms. The front portion was brick and the back weatherboard. In addition to the hotel, the petitioner's interest included one-half of the following: household and kitchen furnishings, various other personal property which was needed and used in the hotel operation, eight small cabins, dance hall shed, 21.88 acres of cleared land and 100 acres of wooded land. Petitioner operated the Patrick Springs Hotel property in partnership with Elinor Wallace as a summer resort and tourist hotel, open approximately five months of each year. A fire occurred at the Patrick Springs Hotel on January 20, 1954. This fire completely destroyed the hotel building and all of the furnishings it contained. The cabins and dance hall were not damaged. The Patrick Springs Hotel was insured at the time of the fire for $10,000 and the contents of the hotel were insured for an additional $10,000. No insurance was carried on the dance hall or cabins. In 1954 petitioner received proceeds from fire insurance companies as a result of said fire at the Patrick Springs Hotel in the *276 amount of $5,000 for the hotel building and in the amount of $2,965.39 for the contents of the hotel which were destroyed as a result of the said fire. The insurance proceeds for the hotel's contents were actually received by petitioner on October 12, 1955. The delay in settlement for the insurance proceeds on the contents was due to a controversy with Elinor Wallace as to petitioner's right to any portion of the proceeds on the contents. The parties have stipulated the assessment records of Patrick County with respect to this property. They show the assessment of all of the land and all of the improvements separately before and after the fire. These records show an allocation of 19 per cent of assessed value to the land and 81 per cent to the improvements and they also show the assessment for improvements after the fire was decreased approximately 72 per cent. Various adjustments made by respondent were based upon his determination allocating 45 per cent of the agreed adjusted basis of the property to the land and 55 per cent to all of the improvements and allocating 50 per cent of the improvements to the hotel that was destroyed in the fire. The improvements on the Patrick *277 Springs property represented 81 per cent of the cost of the property. The Patrick Springs Hotel represented 72 per cent of the value of all buildings and improvements on the Patrick Springs property at the time of the fire. During some of the years in question petitioner owned certain trucks, tractors, sawmill equipment and parts, having various acquisition dates, original costs and estimated lives. The trucks and tractors were originally purchased by the petitioner for use in his business activities, which included lumbering, sawmilling, building and farming. Prior to 1953 they were used extensively by the petitioner in connection with these businesses, particularly in his lumbering operations. In 1953, 1954 and 1955, petitioner found it necessary to devote most of his time to the business of the Stuart Lumber Company. As a result he did not engage in lumbering operations in these years. During the years 1953, 1954 and 1955 the petitioner used the trucks and tractors on his farm. The trucks were also used for various jobs on and about petitioner's rental property. The tractors were used by petitioner during said period on his farm for clearing land. When the trucks were not being *278 used by petitioner at his farm or in connection with business for the rental property, they stood idle on the lot of the Stuart Lumber Company of which petitioner was president. The Stuart Lumber Company occasionally used some of the trucks. When the tractors were not being used on the petitioner's farm, they were parked at the Stuart Lumber Company lot and were idle. The Stuart Lumber Company made no use of the tractors. The trucks in question were purchased from the petitioner by the Stuart Lumber Company in April, 1954, and thereafter were not used by petitioner in any of his personal business operations. Petitioner purchased the sawmill equipment in 1954 and sawmill parts in 1955. During these years petitioner permitted one of his sons to use the sawmill and sawmill equipment in the son's business. Petitioner made no use of the said items in the said years. In his returns petitioner claimed depreciation in some or all of the taxable years involved on the tractors, trucks and sawmill equipment. Respondent disallowed all depreciation claimed by petitioner on these assets. On September 23, 1952, petitioner acquired a timber lease in North Carolina of about 463 acres from one *279 Annie I. Slade. The boundaries of this tract of timber were shown to petitioner by one Rhodes, who informed petitioner that he had authority to sell the timber and that the boundaries which he pointed out were the correct boundaries for the Slade property. The timber lease describes the leasehold area by metes and bounds and by reference to maps. Petitioner relied upon Rhodes' representation as to the boundaries of the property and did not make any further check of them. The petitioner estimated that there were about 2,000,000 feet of timber in the area shown him by Rhodes. On the basis of this estimate, petitioner agreed to pay Annie Slade $27,500 in installments for the timber, a price which was a little less than the current rate for such timber. At the time of the purchase, petitioner intended to cut and sell the timber himself. In about December 1952, petitioner decided that it would be necessary for him to give more time and attention to the business of Stuart Lumber Company and that he would be unable to cut the Slade timber. Accordingly, he sold his contract to his sons and they agreed to pay for it at its cost to him, $27,500. Petitioner's sons traded under the name "Williams *280 Brothers." Prior to the sale of the timber lease to Williams Brothers, petitioner showed his sons the boundary lines as previously pointed out to him by Rhodes. In 1953 Williams Brothers began cutting timber at a site which the petitioner had represented to them to be on the Slade property. Soon thereafter, one R. E. Walker complained to petitioner that William Brothers was cutting timber on Walker's property. An examination of the true boundary lines of the Slade tract showed that Walker was correct. Walker claimed damages against petitioner for the timber already cut. By agreement with Walker, petitioner, on April 30, 1953, paid Walker $2,000 for the timber which had been cut on Walker's property. Thereafter Williams Brothers moved their sawmill to another site on the Slade property. However, before they could start cutting timber at this site, persons claiming to own the site stopped them and said that the sawmill was not on Slade property. Subsequent investigation determined that these persons did indeed own the land in question which contained about 400,000 feet of timber. When the true boundaries of the Slade tract were clearly ascertained, it became apparent that the dimensions *281 of the Slade tract were substantially less than they had been understood to be by petitioner. William Brothers was able to cut only about 1,300,000 feet of timber under the timber contract from the Slade property. Because of the misunderstanding about the boundary of the Slade property, petitioner held back the last payment due on the Slade contract to try to offset what had been lost in the boundary of timber misrepresented by Rhodes. Petitioner's attorney advised that under the contract with Annie Slade, he was legally obligated to pay her the remaining amount due on the contract. Based on this advice, on March 2, 1954, petitioner paid the balance due under the contract, plus interest, to her attorney in the total amount of $4,500. Petitioner claimed a loss of $4,500 on the Slade contract in 1954 which respondent disallowed and, by an amendment to his petition, he claims a loss of $2,000 in 1953 by reason of his payment to Walker of $2,000. During the years 1953, 1954 and 1955, petitioner owned a barn and milkhouse located on a farm operated by him. Petitioner claimed depreciation on his tax returns for each of these buildings on an estimated 20-year useful life. Respondent *282 determined the estimated useful life of the barn at the time of its acquisition by petitioner was 33.3 years and the estimated useful life of the milkhouse at the time of its acquisition by petitioner was 31.4 years. During the years 1953, 1954 and 1955, petitioner owned a frame apartment building which he operated for rental purposes. The building was acquired in 1947 and was about 40 to 50 years old. Petitioner claimed depreciation on this property for the years in question on the basis of a 20-year useful life. Respondent determined the estimated useful life of said apartment at the time of its acquisition by petitioner was 22.3 years. Petitioner failed to file a declaration of estimated tax for the year 1954. Opinion The only issue with respect to the destruction by fire of the Cotton Mill property and the hotel is the portion of the adjusted basis that is to be allocable to the portion of the improvements destroyed by fire. The parties are in substantial agreement as to the underpreciated basis of the Cotton Mill building before the fire. [1] As shown in our findings of fact, we have found the portion of the Cotton Mill property destroyed by fire was 50 per cent of the *283 value of the building. This was petitioner's testimony and it is in substantial agreement with the assessment records for real estate taxes which show a 52 per cent decrease in the assessment of the building after the fire. We have also found the portion of the Patrick Springs Hotel property destroyed by fire was 72 per cent of the value of the improvements on this property. This also accords with the assessment records for real estate taxes which show a 72 per cent decrease in the assessment of the improvements after the fire. Respondent objects to the use of the real estate assessment records and in support of his position that the local real estate assessment records are not competent evidence here, respondent cites William A. Daly, Administrator, 1 B.T.A. 993; Helen Barclay, Executrix, 4 B.T.A. 1139; and Helen D. Emmet, 11 T.C. 90. These cases are not in point. In each, the Court refused to give weight *284 to local real estate assessments which were introduced for the purpose of showing the fair market value of the property involved. Here the local assessed value is not offered by petitioner to show fair market value but rather to show the relative ratio of the value of the improvements before and after the fire. This is using the evidence of assessed values in the same manner as it is often used when cost of the land and cost of improvement thereon must be segregated for depreciation purposes. Hawkins v. Commissioner, 234 F. 2d 359, (reversing a Memorandum Opinion of this Court on another point [14 TCM 382; T.C. Memo. 1955-110].) In the Hawkins case, the Commissioner, himself, divided the entire cost of improved realty into cost of land and cost of improvement by reference to the exact ratio shown by the assessment records for local real estate assessment. With regard to the contents of the carpentry shop, petitioner received $1,375 as proceeds from insurance to compensate for the loss of these assets. Respondent determined that petitioner's adjusted basis in the assets was zero and treated the entire amount of the insurance recovery *285 as a capital gain. The list of tools and equipment and the cost (total $3,400) and estimated useful life, found in our findings of fact, is in accordance with petitioner's testimony. Respondent's argument is that this "self-serving recitation", without any documentary evidence, is insufficient to overcome the presumption of correctness of his determination. The amount of insurance paid ($1,375) for the loss of this equipment is not greatly at variance with the estimated basis shown in petitioner's testimony. We hold the payment of $1,375 insurance to petitioner for the loss of the tools and equipment resulted in no capital gain. Petitioner claimed depreciation in some or all of the taxable years involved on four trucks, two tractors, a sawmill and some sawmill equipment. He testified that prior to 1952 he used the trucks in connection with his lumber activities and to a lesser extent in his farming and property rental operations. During 1953 and 1954 petitioner did not engage in the business of cutting and selling timber because most of his time was devoted to the business of the Stuart Lumber Company. During this time the trucks were little used. Stuart Lumber Company used them *286 on several occasions "in emergencies" and they were used occasionally in petitioner's farming and rental activities. Prior to 1953 the tractors were used in petitioner's farming and timber activities. Petitioner testified that during the years in question the tractors were idle most of the time but were used occasionally in his farming operations. Petitioner acquired a sawmill and sawmill parts in 1954 and 1955. They were used by one of petitioner's sons in 1954 and 1955 in the son's business. In the notice of deficiency respondent disallowed all depreciation claimed by petitioner on the trucks, tractors and sawmill in the years in question. In a protest of the deficiency directed to the district director of internal revenue in 1956, petitioner stated under oath that the assets in controversy were to be used by Williams Brothers without charge pursuant to an arrangement whereby Williams Brothers would cut and furnish timber to the Stuart Lumber Company. From this, respondent concludes that the trucks, tractors and sawmill equipment were used during the taxable years in question in the Williams Brothers' business and were not used or available for use in any trade or business *287 carried on by petitioner. There is no doubt that respondent's determination is correct as to the sawmill and sawmill equipment. They were purchased after petitioner had abandoned the cutting of timber to devote more time to the affairs of the Stuart Lumber Company. There is no evidence to show that the sawmill and equipment were of use or used by petitioner in any of his other activities. On the contrary, it seems clear that either petitioner's son used the sawmill in his business or it was used in the business of Stuart Lumber Company to secure for it a supply of timber. It was not used in petitioner's business and the deduction for depreciation was properly disallowed. Such is not the case with the trucks and tractors. Petitioner had used them in his logging operations prior to 1953. When he ceased logging the vehicles were seldom used except occasionally in his farming and rental operations. We think applicable the rule in Yellow Cab Co. of Pittsburgh v. Driscoll, 25 F. Supp. 993 (cited with approval by us in P. Dougherty Co., 5 T.C. 791, affd. 159 F. 2d 269; Wilson Line, Inc., 8 T.C. 394 relied on by petitioner, which *288 stands for the principle that depreciation may be claimed on assets devoted to a taxpayer's business even though they are idle and are not actually used in the taxpayer's business in years for which depreciation is claimed. Respondent argues that this principle is not pertinent here since the vehicles were not available for use in petitioner's business because they were used either by his sons or by the Stuart Lumber Company. Petitioner and his bookkeeper both testified that the trucks were never used by the sons and were used by Stuart Lumber Company only in "emergencies". Respondent has offered petitioner's 1956 sworn protest in evidence and points to the statement it contains that "* * * the Taxpayer agreed with Williams Brothers that * * * he would let them use his equipment without charge." We think that at best this is evidence only of an agreement, not of the subsequent actions of the parties. We believe petitioner's testimony that even though he signed a sworn statement he did not read its contents but rather relied on his understanding that the accountant who prepared it had included *289 only the sawmill and sawmill parts within the ambit of the protest. Accordingly, we have found that petitioner may take depreciation on the tractors for 1953, 1954 and 1955 and on the trucks for 1953 and for the portion of 1954 prior to their sale to Stuart Lumber Company. In his income tax returns for the years in question, petitioner claimed depreciation on a barn, a milkhouse and a frame apartment building based on a 20-year remaining useful life as of the date of acquisition. In the notice of deficiency respondent determined that the expected useful life of these assets when acquired was 33.3 years, 31.4 years and 22.3 years, respectively. Petitioner supported his estimates of useful life of the buildings by his testimony. He is an experienced businessman and has engaged in the real estate business and in the construction of houses. Respondent did not even bother to cross-examine him as to his useful life estimates for the three buildings. His testimony stands uncontradicted. Respondent introduced no testimony in this case. We uphold petitioner's estimate of useful life of 20 years for the three buildings. In the Slade timber transaction, petitioner in 1952 leased a tract *290 of timber for $27,500 to be used by him for logging purposes. He made the initial payment of $10,500 in 1952 and two other payments of $4,250 each, plus interest, in 1953. Late in 1952 it became apparent to him that he would be unable to log the Slade lease and he sold it to his sons, doing business as Williams Brothers, for its cost to him, $27,500. In 1953 Williams Brothers began logging operations on a tract which they thought the Slade lease covered but which they subsequently discovered belonged to Walker. Petitioner paid Walker $2,000 for damage in 1953. In 1954 petitioner made a final payment of $4,500 to Annie Slade in settlement of their contract. Petitioner's bookkeeper testified from his records that Williams Brothers paid petitioner approximately $21,000 on the Slade contract. On his income tax return for 1953 petitioner made no mention of the $2,000 payment to Walker and first raised the issue in an amendment to the amended petition in which the said amount was claimed as a deduction for 1953. In his income tax return for 1954 petitioner claimed $4,500 as a business expense for "Settlement of cost of timber." Petitioner includes the Walker payment as a cost of the *291 lease and states as his argument: "Thus, it is the petitioner's position that he suffered a total loss on the timber contract of $4,500 and this amount should be allowed as a deduction either $2,000 in 1953 and $2,500 in 1954 or $4,500 in 1954. This loss occurred by reason of the misrepresentation to him of the boundry line. The sale of the timber contract had nothing to do with creating the loss." This is not our view of the transaction. Petitioner purchased rights to timber and bound himself to pay a fixed sum. Because of his failure to check the boundaries of the track, he actually received rights to less than he had anticipated. Petitioner testified that in 1952 he sold the timber rights to his sons for exactly what he paid for it, or $27,500. The only possible loss that he could suffer would be if his sons failed to pay him the $27,500. The evidence is not clear on this point. It appears the sons made at least one payment to Annie Slade of $4,250 on this contract. Petitioner testified he "believed" his sons paid him $25,500 on the contract. His bookkeeper said his sons paid him $21,000 on the contract. However, we need not find just how much petitioner received from Williams *292 Brothers on the contract. If petitioner did suffer any loss it would be a loss from the sale of an asset to members of his family and it would not be deductible for section 267, Internal Revenue Code of 1954, prohibits the deduction of losses from sales of property between members of a family. Any loss which petitioner might have sustained in 1954 on the Slade timber lease resulted from the sale of his interest to his sons and is, therefore, not a permissible deduction. Neither is the $2,000 payment to Walker available as a deduction to petitioner. There is strong intimation in the record that petitioner may have been reimbursed by Williams Brothers for his settlement with Walker. In any event, the trespass upon Walker's property was accomplished by his sons, not by petitioner. In this view petitioner's payment to Walker was the payment of a moral, not a business, obligation, and as such is not deductible. In the notice of deficiency respondent determined an addition to tax for 1954 under section 294(d)(1)(A), Internal Revenue Code of 1939, for failure to file a declaration *293 of estimated tax. Petitioner admits he filed no declaration of estimated tax for that year and he does not contend he had reasonable cause for not filing. Respondent's determination is upheld. Respondent also determined an addition to tax for substantial underestimation under section 294(d)(2), Internal Revenue Code of 1939. This addition is denied. Commissioner v. Acker, 361 U.S. 87. Certain of the adjustments in respondent's determination of deficiency put in issue by the petition have been abandoned or conceded by the parties. Other issues raised by the petition, such as the amount of capital loss carry-over in the several years, depend upon adjustments occasioned by our decisions on the issues discussed above and will abide a Rule 50 computation. Decision will be entered under Rule 50. Footnotes
1. There is a slight difference in the parties' computations of undepreciated basis of the Cotton Mill property before the fire. Respondent's figure is $7,883.48 while petitioner's is $7,758.78. We have accepted petitioner's figure.↩